## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**RICHARD GARAY and PIEDAD**
**"PEGGY" GARAY**,

        Plaintiffs,

    vs.                       No. 07cv307  MCA/WPL

**JAMES HAMILTON CONSTRUCTION**
**CO., et al.,**

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendants' Motion for Summary Judgment and Memorandum Brief* [Doc. 36], filed April 21, 2008.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motion as to Counts I, II, and IV of the *Complaint for Damages* and declines to exercise supplemental jurisdiction over the state-law claims asserted in Counts III and V.

## I. BACKGROUND

Defendant James Hamilton Construction Company ("JHCC") is a heavy-construction company based in Silver City, New Mexico.  At all relevant times, JHCC carried an employee benefit plan called the James Hamilton Construction PPO Options Plan.  This plan was a qualified benefits plan subject to ERISA, and through it JHCC provided Blue Cross Blue Shield ("BCBS") health insurance to its employees.

Plaintiff Richard Garay was JHCC's chief engineer from May 9, 1973 until 2006.  Mr. Garay's position was a full-time job requiring extensive travel.  Typically, Mr. Garay would spend one day in the office in Silver City, and the other days in the field.  His job duties included (1) supervising and working alongside his crews; (2) servicing pits; (3) checking bridges and other projects over uneven and rough ground; and (4) walking up and down grades where roads were being built.  There was a time when Mr. Garay worked 16 to 18 hours a day.  [Doc. 36 at 9]

In early 2005, however, Mr. Garay was diagnosed with end-stage renal failure and at that time he started dialysis.  By the spring of 2006, Mr. Garay was no longer working 16 to 18 hour days.  Medical records from this time period reveal that in addition to suffering from kidney disease, Mr. Garay also (1) was obese; (2) suffered from Type 2 diabetes mellitus; (3) had previously undergone coronary artery bypass surgery; and (4) had a history of hypertension. [Doc. 36; Exh. 14, "Presbyterian Healthcare Services Consultation"].

In March or April of 2006, Mr. Garay and JHCC President Charles Hamilton began discussing under what circumstances Mr. Garay would separate from employment. Insurance coverage was of primary concern to Mr. Garay, and it is undisputed that he told Mr. Hamilton that he would separate if he had "policies in hand [providing] full coverage." [Doc. 36; Exh. 1, R. Garay depo. at 119].  Through his deposition, Mr. Garay further testified that he explained:

> I told him, "I'm not leaving, Chuck.  Mr. Hamilton, *I'm not leaving because I don't have insurance*.  And in my situation I can't get insurance anywhere else because of my situation."

2

> And I said, "And I won't quit until I see in my hand that I have
> full coverage and that I won't suffer any problem with
> insurance, with paying my insurance. My health problems." So
> then he said, "Well, Dick, I can help you get supplemental
> insurance."
>
> And so he picked up the phone and he talked with Manuel Lujan
> Insurance.
> . . .
> And then they talked about this and that insurance. And he said,
> "Dick, I'm going to try to help you get"—I said, "I want full
> coverage, Chuck," Mr. Hamilton.

[Id. at 205-206 (emphasis added)]. In short, Mr. Garay agreed that if he had "equivalent

health insurance in hand" he would leave. [Id. at 244]. Mr. Garay knew that supplemental

coverage would be unnecessary if he were to remain with JHCC. [Doc. 36 at 7].

Thereafter, in a memorandum dated May 2, 2006, Mr. Garay wrote to Mr Hamilton:

> I have completed the [BCBS] application as you requested. I
> want to make clear that I am submitting this application with the
> understanding that I will not incur any more expense for my
> coverage than at present and that the coverage will be the
> equivalent of what the company currently provides to me. If
> this understanding is not correct, let me know immediately
> because I will need more time to consider my options.

[Doc. 36; Exh. 10]. At his deposition, Mr. Garay was unable to testify that the coverage he

was applying for was *not* equivalent to the coverage provided to JHCC employees. [Id.; Exh.

1, R. Garay depo. at 238].

For his part, Mr. Hamilton testified that he received confirmation from BCBS

> that they would accept . . . Mr. Garay . . . on their supplemental
> policies; and I was told that, and I told Mr. Garay that that was
> the case, that we had confirmation, because he was real
> concerned, and so he wanted to know for sure that he had

confirmation that he was going to be on that policy, and I had
told him that he would be on that policy.
 . . .

[H]e had to be sure we were going to get that insurance and he
was going to be—that he was eligible for it.

[Doc. 39; Exh. 7; C. Hamilton depo. at 23-24].  According to Mr. Hamilton, he was advised

that Mr. Garay "qualified in every way" and also that the coverage Mr. Garay would be

receiving "was as good a coverage as what [JHCC employees] had." [Id. at 25, 27].  Mr.

Hamilton, therefore, believed that he had satisfied Mr. Garay's conditions for separation

from service and it was his understanding that Mr. Garay was going to retire. [Id. at 23, 27].

In a letter dated May 22, 2006, Mr. Hamilton confirmed with Jessica Brand, former

Medicare specialist at the Manuel Lujan Insurance Agency, "that Mr. Richard Garay [would]

be retiring from [JHCC] on May 31 2006. . . ." [Doc. 39; Exh. 27].  Mr. Hamilton testified

that he wrote this letter because Ms. Brand had advised him that before "Mr. Garay [could]

go on insurance," the agency needed confirmation that he was no longer employed with

JHCC. [Id.; Exh. 7, C. Hamilton depo. at 22].

Before Mr. Garay could be enrolled with BCBS, however, BCBS needed to have his

application, which Mr. Garay told Mr. Hamilton "he had misplaced or did not have. . . ."

[Doc. 39;  C. Hamilton depo. at 29].  Accordingly, on May 23, 2006, Mr. Hamilton had his

son hand-deliver to Mr. Garay's house another application package.  On this date, however,

Mr. Garay was in the hospital.  Still, a BCBS "Application for Medicare Supplement

Policies" appears to bear Mr. Garay's signature and is dated May 24, 2006. [Doc. 39; Exh.

28]. A letter on "Blue MedicareRx" letterhead received by the Manuel Lujan Insurance Agency on August 10, 2006 informs that Mr. Garay's coverage was approved with an effective date of August 1, 2006, which date was "corrected to 6/1" in a handwritten note. [Id.; Exh. 31].

In a memorandum dated June 8, 2006, Mr. Garay wrote the following to Mr. Hamilton:

> I was extremely disturbed to receive the attached draft of correspondence[1] indicating that I had decided to "retire" from [JHCC] while I was hospitalized and unable to take calls or respond to any requests from the company. As you know, I have not tendered my resignation. If the company wants me to leave, I would consider doing so under the proper circumstances and for an acceptable severance. Otherwise, I consider this unacceptable harassment that is the result of my age and medical disability.

[Doc. 39; Exh. 30]. In a memorandum dated June 12, 2006 and directed to both Mr. Hamilton and Jessica Brand, Mr. Garay wrote:

> We enclose the application information for Peggy [Mrs. Garay] for the [BCBS] application as you requested. I want to make clear, once again, that I am submitting this application with the understanding that I will not incur any more expense for my coverage than at present and that the coverage will be the equivalent of what the company currently provides to me. In addition, I want to make clear that by submitting my application and the application for Peggy, I am not in any way compromising my ability to continue my employment with the company. If this understanding is not correct, let me know immediately because I will need more time to consider my options.

---

[1] While it is not entirely clear from the record, the referred-to "draft of correspondence" is presumably Mr. Hamilton's May 22, 2006 letter to Jessica Brand.

[Doc. 39; Exh. 34].

In response to the June 12, 2006 memorandum, JHCC's attorney, Jeffrey A. Dahl, sent a letter to Mr. Garay, explaining, among other things, that (1) JHCC had received Peggy Garay's BCBS application and would submit it to BCBS; (2) the coverage for which the Garays had applied was equivalent to the coverage that had been provided by JHCC and that JHCC did not anticipate Mr. Garay incurring additional expenses for that coverage; (3) JHCC had relied on representations from Mr. Garay that, once he had obtained the insurance coverage in question, he would leave the company; (4) as a consequence, JHCC considered Mr. Garay's retirement effective immediately; and (5) Mr. Garay's stated intentions to remain with JHCC did not comport with his previous representations. [Doc. 1; Exh. C].

At the relevant time, Kimberly Moon was the JHCC employee responsible for sending notices to former employees (and their spouses) pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA").[2]  It is undisputed that Mr. Garay never received a COBRA notice.  Ms. Moon's understanding, however, was that COBRA cannot be extended to an individual "over 65 and qualified for Medicare." [Doc. 39; Exh. 3; K. Moon depo. at 37].

On March 29, 2007, the Garays filed their *Complaint for Damages*, alleging that (1) Defendants violated ERISA by failing to provide a COBRA notice (Count I); (2) Mr. Garay was terminated or, alternatively, constructively terminated, in violation of the

---

[2]  COBRA provides certain former employees, spouses, and others the right to temporary continuation of health coverage at group rates.  See http://www.dol.gov/ebsa/faqs/faq_consumer_cobra.html.

Americans with Disabilities Act ("ADA") (Count II); (3) Mr. Garay was terminated or, alternatively, constructively terminated, in violation of the New Mexico Human Rights Act (Count III); and (4) Mr. Garay was terminated or, alternatively, constructively terminated, in violation of the Age Discrimination in Employment Act ("ADEA") (Count IV). In Count V, the Garays raise state-law claims for promissory estoppel, breach of implied contract, and fraud in the inducement. [See generally Doc. 1]. On April 21, 2008, Defendants moved for summary judgment on all claims.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed.R.Civ.P. 56(e). Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Id. Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying

a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324. It is not the court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

It bears noting that "[w]hen a case turns on the intent of one party, as employment discrimination claims often do, a 'trial court must be cautious about granting summary judgment.'"  Douglas v. Victor Capital Group, 21 F.Supp.2d 379, 388 (S.D.N.Y. 1998) (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2nd Cir. 1994)).  Since it is unlikely that the employer has left direct evidence of discriminatory intent, "the Court must carefully comb the available evidence in search of circumstantial proof to undercut the [employer's] explanations for its actions."  Id.  "Nonetheless, when the defendant provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the defendant."  Id.

## B. The ADA and the ADEA

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application

procedures, the hiring, advancement, or discharge of employees, employee compensation,

job training, and other terms, conditions, and privileges of employment." 42 U.S.C.

§ 12112(a).  To establish a prima facie case of discrimination under the ADA, a plaintiff

must show that (1) he is "disabled" within the meaning of the ADA; (2) he is qualified, with

or without reasonable accommodation, to perform the essential functions of the job he holds

or desires; and (3) his employer discriminated against him because of his disability.  See

Jones v. U.P.S., Inc., 502 F.3d 1176, 1189 (10th Cir. 2007).

   Mr. Garay also alleges discrimination on the basis of age, in violation of the ADEA.

"The ADEA was passed 'to promote employment of older persons based on their ability

rather than age' and 'to prohibit arbitrary age discrimination in employment.'" MacKenzie

v. City and County of Denver, 414 F.3d 1266, 1276 (10th Cir. 2005) (*quoting* 29 U.S.C.

§ 621(b)).   Among other things, the ADEA prohibits an employer from "fail[ing] or

refus[ing] to hire or to discharge any individual or otherwise discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's age."  MacKenzie, 414 F.3d at 1276-77 (*quoting* 29 U.S.C.

§ 621(a)(1)).

   Under the disparate-treatment theory[3] of age discrimination under the ADEA, a

---

   [3] It is not entirely clear from the pleadings the precise theory under which Mr. Garay
asserts his ADEA claim or even, given that the word "age" does not once appear in his response
to Defendants' summary-judgment motion, if the ADEA claim has been abandoned.
Nevertheless, because the Garays allege in their *Complaint for Damages* that "[JHCC's]
termination, alternatively constructively [sic] termination of [Mr. Garay] was motivated by [his]
age[,]" the Court will analyze the ADEA claim as if it arises under the disparate-treatment theory
of discrimination.  See 14A C.J.S. CIVIL RIGHTS § 264 ("When an ADEA plaintiff alleges

plaintiff must produce evidence at a minimum establishing that he was (1) a member of a protected class; (2) disciplined; and (3) treated differently from similarly situated non-protected employees for the same or similar conduct.  Employees are considered "similarly situated" when they (1) deal with the same supervisor; (2) are subjected to the same work standards; and (3) have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.  MacKenzie, 414 F.3d at 1277.

In cases where direct evidence of discrimination is lacking, the burden-shifting framework first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973) applies.  MacKenzie, 414 F.3d at 1274 (10th Cir. 2005).  What this means in the summary-judgment context is that

> the plaintiff bears the initial burden of establishing a prima facie case by a preponderance of the evidence. Once the plaintiff has established a prima facie case, a rebuttable presumption of unlawful discrimination arises.  The defendant then bears the burden of producing a legitimate, nondiscriminatory reason for the adverse employment decision.  If the defendant is able to articulate a valid reason, the plaintiff has the opportunity to prove that the defendant's stated reason was in fact pretext.  At all times, the plaintiff bears the ultimate burden of proving discrimination.

Butler v. City of Prairie Village, Kan., 172 F.3d 736, 747-748 (10th Cir. 1999) (internal citations and quotations omitted).

---

disparate treatment, liability depends on whether age actually motivated the employer's decision. . . .").

It is critical to remember that the Court's role in enforcing such anti-discrimination statutes as the ADA and the ADEA is to prevent intentional discriminatory practices, "not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." Young v. Dillon Cos., Inc., 468 F.3d 1243, 1250 (10th Cir. 2006). Indeed, "[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." Swackhammer v. Sprint/United Mgt. Co., 493 F.3d 1160, 1170 (10th Cir. 2007). Consequently, "[t]his line of argument often can provide a good defense; after all, people make mistakes and [anti-discrimination statutes do] not provide a cause of action for every human resources department error." Orr v. City of Albuquerque, --- F.3d ----, 2008 WL 2652711, at *5 (10th Cir. 2008) (Title VII action). Instead, to survive summary judgment a plaintiff must "come forward with evidence from which a jury could conclude that the defendants' behavior was the result of something more than a mistake—namely, discriminatory animus." Id.

In this case, the question of whether JHCC discriminated against Mr. Garay on the basis of his age and/or disability collapses into the consideration of pretext. See Ernesti v. City of Sioux Falls, S.D., No. CIV. 06-4252, 2008 WL 552874, at *3 (D.S.D. Feb. 26, 2008).[4] It is undisputed that, in the March/April 2006 time period, Mr. Garay and Mr.

---

[4] Ernesti was an ADEA case in which the plaintiff, James Ernesti, emerged from a 2005 interview process with the City of Sioux Falls (S.D.) as the preferred candidate for the position of full-time traffic-service worker. However, the City ultimately offered the position to a younger and "less preferred" person on the ground that Mr. Ernesti, who had earlier retired from another full-time City position, was not eligible to be hired for the applied-for job because he

Hamilton were discussing the circumstances under which Mr. Garay would separate from service with JHCC. [See Doc. 36 at 7; Doc. 39 at 1].  It is undisputed that Mr. Garay told Mr. Hamilton that he would not leave before having in hand full insurance coverage, and that Mr. Hamilton, having offered to secure that insurance, "picked up the phone and . . . talked with Manuel Lujan Insurance . . . about this and that insurance." [Doc. 36; Exh. 1, R. Garay depo. at 205].  Mr. Garay also told Mr. Hamilton that "if [he] g[o]t policies in hand and it cover[ed] him], then [he would] leave employment."  Doc. 36 at 7; Doc. 39 at 1].

In his memorandum of May 2, 2006, Mr. Garay advised Mr Hamilton that he had

> completed the [BCBS] application as [Mr. Hamilton had] requested[, although he] want[ed] to make clear that [he was] submitting this application with the understanding that [he would] not incur any more expense for [his] coverage than at present and that the coverage w[ould] be the equivalent of what the company currently provide[d him].

[Doc. 36; Exh. 10].  Mr. Garay knew that supplemental coverage would be unnecessary if

---

was a retiree who was drawing pension benefits from a City retirement plan ("the Plan").  The City believed that full-time workers were required to be members of the Plan, but that members could not also draw benefits.  In other words, the City believed that Mr. Ernesti could not work full time for the City and be a member of the Plan while simultaneously receiving Plan benefits.  For this reason, the City deemed Mr. Ernesti not qualified for the traffic-service position.

Mr. Ernesti made "a single argument that there [was] age discrimination—that the City's reliance upon the Plan to disqualify him from being rehired for the full time position [was] a phony reason."  Ernesti, 2008 WL 552874, at *3.  In conducting its burden-shifting analysis, the district court explained that "under the circumstances . . . whether Mr. Ernesti was or was not a person qualified for the position collapse[d] into the consideration of pretext at the third stage of the McDonnell Douglas method of proof. . . ."  Id.  In the end, Mr. Ernesti's failure to adduce evidence tending to show that the City did not honestly believe that its interpretation of the Plan rendered Mr. Ernesti unqualified for the traffic-service position was fatal to his ADEA claim.  After all, it is "[e]vidence, not contentions, [that] avoids summary judgment."  Id. at *5 (quoting Sloat v. Rapid City Area Sch. Dist. No. 51-4, 393 F.Supp.2d 922, 933 (D.S.D. 2005)).

he were to remain with JHCC. [Doc. 36 at 7].   Through his deposition, Mr. Hamilton testified that he understood that the coverage Mr. Garay would be receiving "was as good a coverage as what [JHCC employees] had[;]" Mr. Hamilton, therefore, believed that he had satisfied Mr. Garay's conditions for separation from service.  [Doc. 39; Exh. 7; C. Hamilton depo. at 23-25, 27].  Conversely, at his deposition, Mr. Garay was unable to testify that the coverage he was applying for was *not* equivalent to the coverage provided to JHCC employees. [Doc. 36; Exh. 1, R. Garay depo. at 238].

A BCBS "Application for Medicare Supplement Policies" dated May 24, 2006 bears Mr. Garay's signature.  [Doc. 39; Exh. 28].  A letter on "Blue MedicareRx" letterhead received by the Manuel Lujan Insurance Agency on August 10, 2006 informs that Mr. Garay's coverage was approved with an effective date of August 1, 2006, which date was "corrected to 6/1" in a handwritten note.  [Id.; Exh. 31].  Mr. Garay has presented no evidence tending to show that JHCC did not honestly believe that his separation from service was imminent and, in fact, the evidence of record fully supports such a belief.  See Leibforth v. Belvidere Nat. Bank, 337 F.3d 931, 933-934, (7th Cir. 2003) (affirming grant of summary judgment for defendant/former employer absent evidence of pretext, and explaining that "[t]hough Leibforth now asserts that she never had any intention of retiring,  the relevant question for purposes of our pretext analysis is whether the Bank honestly believed that she did, and Leibforth presented no evidence showing that that was not the case.").  In this case, JHCC may have been wrong in its belief that Mr. Garay as going to retire or resign (though, as in Leibforth, "the evidence overwhelmingly shows that it was not"), but Mr. Garay has

presented no evidence tending to demonstrate that JHCC's belief was not an honestly held one. See id. at 934. Summary judgment will be entered for Defendants on the Garays ADA and ADEA claims.

### C. ERISA/COBRA

COBRA, which stands for Consolidated Omnibus Budget Reconciliation Act, is an amendment to ERISA and "authorizes a qualified beneficiary of an employer's group health insurance plan to maintain coverage when [he] might otherwise lose coverage upon the occurrence of a "qualifying event." Simpson v. T.D. Williamson Inc., 414 F.3d 1203, 1204 (10th Cir. 2005); see also 29 U.S.C. § 1161. A "qualifying event" includes "[t]he termination . . . of the covered employee's employment[,]" 29 U.S.C. § 1163(3), and "requires the health plan administrator to notify the beneficiary that [he] may elect to continue health insurance coverage in return for premium payments." Simpson. 414 F.3d at 1204. This continuation coverage begins on the date of the qualifying event and ends 18 months later. 29 U.S.C. § 1162(2)(A)(i).

In this case JHCC does not deny that it failed to notify the Garays of their rights under COBRA; the issue, therefore, is what, if anything, is the proper remedy. See 29 U.S.C. § 1166(1) ("[T]he group health plan shall provide, at the time of commencement of coverage under the plan, written notice to each covered employee and spouse of the employee (if any) of the rights provided under this subsection. . . .").

 "The purpose of the civil enforcement provisions of COBRA is, above all, to put plaintiffs in the same position they would have been in but for the violation." Van Hoove

v. Mid-America Bldg. Maint. Inc., 841 F.Supp. 1523, 1536 (D.Kan. 1993).  Still, medical

bills alone are not the proper measure of damages because "[t]he [C]ourt must reduce the

amount by any deductibles or co-payments, as well as the premium that [a plaintiff] would

have had to pay had [the plaintiff] elected continuation coverage."  Id.

In this case, Mr. Garay has stated that if he had known that his group insurance

coverage was going to end, he "would definitely have elected continuation coverage under

Cobra." [Doc. 39; Exh. 1, Garay Affidavit at 5].  Although the Garays incurred $381,000 in

medical bills since June 2006, it is undisputed that as of February 20, 2008, all of these bills,

minus $23,000 due to Mountain View Regional Medical Center, had been paid. [Doc. 36;

Exh. 22 at 1; Doc. 39 at 1].  At the time Mr. Garay left JHCC, the monthly COBRA premium

was $1,349.40 for a family. [Doc. 36; Exh. 23; Hamilton Affidavit].  Had the Garays elected

continuation coverage under COBRA, they would have paid $24,289.20 in premiums over

an 18-month period, which exceeds the $23,000 that was owing as of February 2008.

The Garays have sought emotional-distress damages, statutory damages, and

attorneys' fees as a result of the COBRA violation.  In support of their request for emotional-

distress damages, the Garays cite, among other cases,  Kolstad v. Am. Dental Ass'n, 527

U.S. 526 (1999).   [Doc. 39 at 9, 12].  However, as Defendants point out, Kolstad was not

an ERISA/COBRA case; instead, it arose under Title VII.  Other cases have specifically

stated that "COBRA does not provide for an emotional damages claim. . . ."  Gonzalez

Villanueva v. Warner Lambert, 339 F.Supp.2d 351, 360 (D.P.R. 2004) (collecting cases).

Accordingly, the Court will not award damages for emotional distress.

15

With respect to statutory damages, 29 U.S.C. § 1132(c)(1) gives the Court discretion to hold a plan administrator personally liable in the amount of up to $100 per day for the administrator's failure to provide proper notice of a party's COBRA rights.  See 29 U.S.C. § 1132(c)(1).  While "neither prejudice nor bad faith is required for a district court to impose penalties under 29 U.S.C. § 1132(c), the presence or absence of these factors can certainly be taken into account by a district court in deciding whether to exercise its discretion and impose a penalty."  Deboard v. Sunshine Min. and Refining Co., 208 F.3d 1228, 1244 (10th Cir. 2000).  Ultimately, the Garays were not prejudiced by JHCC's failure to provide them with notice of their COBRA rights because the bulk of their medical expenses have been reimbursed and the remaining amount of $23,000 is less than what they would have paid in premiums had they elected continuation coverage.  Also, there is no evidence in the record that JHCC withheld COBRA notice in bad faith; rather, the evidence supports the conclusion that JHCC simply misunderstood the pertinent COBRA provisions.  For these reasons, the Court declines to assess statutory damages against JHCC.[5]

Finally, because the Garays are not prevailing parties, the Court concludes that they are not entitled to attorneys' fees.  See Andrews v. Blue Cross Blue Shield of Nebraska

---

[5] That the Garays, in the end, were not prejudiced by JHCC's conduct and that JHCC did not demonstrate bad faith does not, in this Court's view, excuse JHCC's actions.  Because of JHCC's mistake and misinterpretation of a law it should fully have understood, the Garays were forced to live, at least for a time, with the knowledge that nearly $400,000 in unpaid medical bills loomed.  The Court does not doubt that this caused significant distress to the Garays.  Still, the Court concludes that the correct legal decision under the circumstances is not to assess statutory penalties against JHCC.  However, the Court urges JHCC to educate itself as to its statutory obligations toward its employees.

<u>Employee Group Long Term Disability Ins. Plan</u>, 165 Fed.Appx. 650, 655 (10th Cir. 2006) (noting that, while 29 U.S.C. § 1132(g)(1) contemplates "a reasonable attorney's fee and costs of action to either party. . . [t]his circuit's precedent suggests that a party must prevail in order to be considered for an award of attorney's fees and costs under ERISA."). Summary judgment will be entered in favor of Defendants on Counts I, II, and IV of the *Complaint for Damages*.

### C. The State-Law Claims

In addition to their ADA, ADEA, and ERISA/COBRA claims, the Garays have asserted state-law claims for breach of implied contract, fraud in the inducement, and promissory estoppel. They also claim that Mr. Garay was terminated or constructively terminated in violation of the New Mexico Human Rights Act. [<u>See generally</u> Doc. 1]. In asserting these claims, the Garays invoke the Court's supplemental jurisdiction. For the reasons that follow, the Court declines to exercise its supplemental jurisdiction over the Garays' state-law claims.

Section 1367 of Title 28 of the United States Code provides, in pertinent part, that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy  . . . ." 28 U.S.C. § 1367(a). Pursuant to subsection (c), however, the Court may decline to exercise its supplemental jurisdiction if, among other things, it has dismissed all claims over which it had original jurisdiction. 28 U.S.C. § 1367(c)(3). In other words, once "the bases for

17

federal subject matter jurisdiction have been extinguished[,] the district court may decline to exercise continuing 'pendent or supplemental jurisdiction over [the] plaintiff's state claims." Lancaster v. Indep. Sch. Dist. No. 5, 149 F.3d 1228, 1236 (10th Cir. 1998) (dismissing without prejudice plaintiff's claims for, *inter alia*, breach of contract after having entered summary for defendant on plaintiff's First and Fourteenth Amendment claims); see also Taylor v. Meacham, 82 F.3d 1556, 1564 n.1 (10th Cir. 1996) ("Once a federal court dismisses claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over related state law claims.").

In the instant action, the entry of summary judgment in favor of Defendants on Counts I, II, and IV extinguishes the basis for federal subject matter jurisdiction. See Lancaster, 149 F.3d at 1236. Accordingly, the Court declines to exercise its supplemental jurisdiction over the Garays' state-law claims. See 28 U.S.C. § 1367(c)(3). In so declining, the Court has considered whether the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction. See Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995). The Court is not convinced that these factors weigh in favor of retaining jurisdiction. The alleged agreement to retire or separate from service that is at the heart of the Garays' termination, constructive-termination, and contract claims is subject to evaluation under state law and, thus, best suited to adjudication in a state court. Notions of comity and federalism demand that a state court try such claims in the first instance, absent compelling reasons to the contrary. See Thatcher Enters. v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir. 1990). In addition, the

Court's decision not to exercise supplemental jurisdiction is not necessarily fatal to the Garays' state-law claims, as 28 U.S.C. § 1367(d) may provide for the tolling of any limitations period regarding these claims.  For these reasons, the Garays' claims for breach of implied contract, fraud in the inducement, promissory estoppel, and violations of the New Mexico Human Rights Act will be dismissed without prejudice.  See Lancaster, 149 F.3d at 1236 (where district court had entered summary judgment for defendant on plaintiff's federal claims, affirming district court's decision to dismiss without prejudice plaintiff's state-law claims).

## III. CONCLUSION

For the foregoing reasons, summary judgment is granted to Defendants with respect to Counts I, II, and IV of the Garays' *Complaint for Damages*.  Counts III and V are dismissed without prejudice.

**IT IS, THEREFORE, ORDERED** that *Defendants' Motion for Summary Judgment and Memorandum Brief* [Doc. 36] is **GRANTED** as to Count I;

**IT IS FURTHER ORDERED** that Count I is **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER ORDERED** that *Defendants' Motion for Summary Judgment and Memorandum Brief* [Doc. 36] is **GRANTED** as to Count II;

**IT IS FURTHER ORDERED** that Count II is **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER ORDERED** that *Defendants' Motion for Summary Judgment and Memorandum Brief* [Doc. 36] is **GRANTED** as to Count IV;

**IT IS FURTHER ORDERED** Count IV is **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER ORDERED** that Count III is **DISMISSED WITHOUT PREJUDICE**;

**IT IS FURTHER ORDERED** that Count V is **DISMISSED WITHOUT PREJUDICE**;

**IT IS FURTHER ORDERED** that the **PRETRIAL CONFERENCE** set for TUESDAY, September 2, 2008, at 9:00 a.m., the **CALL OF THE CALENDAR** set for THURSDAY, October 9, 2008, at 9:00 a.m., and the **JURY SELECTION/TRIAL** set for TUESDAY, October 14, 2008, at 9:00 a.m. are hereby **VACATED**.

**SO ORDERED** this 14th day of August, 2008, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge